Levester THOMPSON, M.D., Plaintiff,

v.

WISE GENERAL HOSPITAL, St. Mary's Hospital, Inc. and Norton Community Hospital, Defendants.

Civ. A. No. 86–0200–B.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Feb. 24, 1989.

Levester Thompson, M.D., Emporia, Va., pro se.

Elsey A. Harris, III, Norton, Va., William W. Eskridge, Abingdon, Va., D. Stan Barnhill, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

The plaintiff, Levester Thompson, M.D., brought suit against the three defendant hospitals after they had terminated his privilege to admit patients. He alleges that they conspired to deprive him of his livelihood in violation of 42 U.S.C. § 1985(3); conspired to injure him in his business or profession in violation of Va. Code Ann. §§ 18.2–499 and 18.2–500 (1988); conspired in restraint of trade in violation of §§ 1 and 2 of the Sherman Antitrust Act; and that they interfered with his contractual rights in violation of 42 U.S.C. § 1981. The defendants have moved to dismiss pursuant to Fed.R.Civ.Proc. 12(b)(1) and 12(b)(6).

Although the factual background of the case is not complex, its procedural history is checkered, largely due to Dr. Thompson's frequent changes of counsel and present position before the court as a *pro*

*se* plaintiff,[1] with frequent abandonment then recrudescence of causes of action and parties defendant. Briefly, however, Dr. Thompson filed suit in December 1986 against the three hospital defendants and eleven individuals (doctors and administrators) associated with the hospitals. The court dismissed the claims against the individuals on motion of Dr. Thompson's then attorney; another attorney subsequently attempted to reassert the claims against the individual defendants, as did Dr. Thompson after he began representing himself. After the last of Dr. Thompson's four attorneys withdrew in a dispute over fees, the court entered an order dated September 13, 1988 granting Dr. Thompson thirty days to obtain service on the individual defendants. When this was not done, the court entered an order dismissing the case against the individuals with prejudice. The case is now before the court on the motions to dismiss filed by the three hospitals.

The gravamen of the complaint is that the defendants conspired to deprive the plaintiff, who is black, of his livelihood by denying him hospital privileges, without which he could not, it is claimed, practice medicine in Wise County, Virginia. The hospitals are all located in Wise County.

Dr. Thompson's Second Amended Complaint alleged that his staff privileges at St. Mary's Hospital in the City of Norton, Virginia, were terminated after complications developed in one of his patients who had been operated on for a ruptured appendix. Dr. Thompson did not perform the operation and alleges that the real culprit was the patient's surgeon, who received only a reprimand from the hospital and continues to practice there. After his privileges were suspended by letter on November 16, 1984, he was afforded a hearing in January 1985 at which two members of St. Mary's administration and its lawyer were present, in addition to Dr. Thompson and his lawyer. The hearing proceeded despite the complaints of Dr. Thompson's lawyer that a quorum was not present. Dr. Thompson alleges that no official decision was ever reached by the panel and that he was denied the opportunity to appeal to the hospital's Board of Trustees, as set out in St. Mary's bylaws.

Dr. Thompson was suspended from his obstetrics practice at Wise Hospital in Wise, Virginia following two incidents late in 1985 which caused the hospital staff to question the adequacy of care he provided during and after the time two of his patients were giving birth. Once again, Dr. Thompson denies that he in any way deviated from the applicable standard of care. Nevertheless, the Board of Trustees of Appalachian Regional Healthcare, the owners of Wise Hospital, voted to terminate his privileges in obstetrics.

The story at the third area hospital, Norton Community, was much the same, with Dr. Thompson losing his privileges in the Intensive Care Unit when one of his patients died after an operation (performed by another doctor) and another patient suffered post-operative complications. In both instances, the plaintiff maintains that the problems were the result of the actions of other doctors involved in the case. Nevertheless, after a full review, an *ad hoc* committee of the hospital staff recommended that his privileges at the ICU be revoked, which action was confirmed by the hospital's Board of Trustees. The revocation was effective as of August 1, 1986. The Board of Trustees and the medical staff reaffirmed the decision two weeks later.

As a result of the loss of these privileges at the hospitals in the Norton–Wise area, the plaintiff alleges that he was forced to move to Emporia, Virginia, in the eastern part of the state, to begin his practice anew. He says that as a result of the stain on his record caused by the defendants, however, he has not been able to get full staff privileges at the local hospital.

---

1. At least technically. Although he is not currently represented by counsel, all of the Second Amended Complaint was prepared by a Richmond attorney who was employed by Dr. Thompson until last Fall. Dr. Thompson has not prepared any new pleadings, but is relying completely on the attorney-prepared complaint.

## I.

█ Count I of the complaint alleges a violation of 42 U.S.C. § 1985(3), which states, in relevant part, that

[i]f two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The key word in the statute is "conspire." Before a claim under it can be made out, a claim of conspiracy must be "alleged with sufficient specificity and factual support to suggest a 'meeting of the minds.'" *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir.1985). Although the Amended Complaint does specifically allege that "Defendants, with express knowledge of the action of the other Defendants, acting upon such knowledge, engaged in a concerted and conspiratorial effort to deprive Plaintiff, by reason of his race, of his livelihood," the specific factual allegations set out in the complaint provide no support whatever for this legal conclusion. Assuming that everything happened exactly the way the complaint alleges that it did, the most that it has shown is that each hospital, apparently acting independently, terminated Dr. Thompson's privileges for problems that were someone else's fault. Notably, the termination by Wise General came 14½ months after the termination by St. Mary's, and Norton Community terminated Dr. Thompson's ICU privileges more than six months after that, or nearly two years after St. Mary's. A hospital, being an inanimate entity, cannot itself conspire with anyone or anything; some human agency must be involved. There is no indication in the complaint of who, when, how, or where

any doctors, administrators, or other individuals connected with any of the defendants conspired to deprive Dr. Thompson of any rights or privileges. And the timetable of the terminations, spread out over two years, is hardly silent evidence of a conspiracy.

The Supreme Court has stated, in discussing the requirements of a § 1985 claim, that

the language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action.

*Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

The plaintiff has not shown any race-based animus behind the terminations, nor that the terminations were in any way connected with each other. To sufficiently allege conspiracies under the Civil Rights Acts

federal courts have come to insist that the complaint state with specificity the facts that, in the plaintiff's mind, show the existence and scope of the alleged conspiracy. It has long been the law ... that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts.

*Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977) *cert. den.* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). *Accord Briscoe v. Lahue*, 663 F.2d 713, 723 (7th Cir. 1981); *affirmed* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Arseneaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir.1982); *Croatan Books, Inc. v. Virginia*, 574 F.Supp. 880, 888 (E.D.Va.1983).

As the complaint makes no reference to material facts, the § 1985 count must be dismissed.

## II.

### A.

█ The plaintiff's claim that the defendant hospitals interfered with his contrac-

tual rights is based on 42 U.S.C. § 1981, which states:

> All persons within the jurisdiction of the United States shall have the same right in every state ... to make and enforce contracts ... and to the full and equal benefits of all laws ... as is enjoyed by white citizens.

The two "prongs" of this section are those concerning 1) contracts and 2) equal benefits. The Fourth Circuit twice has ruled that state action is required to bring an "equal benefits" action. *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523, 527 (4th Cir.1986), *rev'd in part on other grounds* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987); *Eggleston v. Prince Edward Volunteer Rescue Squad*, 569 F.Supp. 1344 (E.D.Va.1983), *affirmed* 742 F.2d 1448 (4th Cir.1984).

Defendants maintain that since they are private hospitals there is no element of state action and Dr. Thompson therefore has no case to bring under this clause. As the Third Circuit has pointed out:

> The state, not the individual is the sole source of law, and it is only the state acting through its agents, not the private individuals, which is capable of denying to blacks the full and equal benefit of the law.

*Mahone v. Waddle*, 564 F.2d 1018, 1029 (3d Cir.1977), *cert. den.* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978).

Although the plaintiff attempts to distinguish *Mahone* by claiming that the above quotation is dicta, the endorsement of the view it expresses by the Fourth Circuit in *Shaare Tefila* is definitely not dicta, and is therefore binding on this court. Accordingly, the complaint under the "equal benefits" prong of § 1981 will be dismissed.

### B.

■ The "contract prong" of § 1981 naturally requires a contractual relation before it can come into play; no state action is of course required. *Mahone*, 564 F.2d at 1029.

The plaintiff contends that he did have contracts with the defendants, evidenced by "agreements with each defendant hospitals [sic]. The nature of the agreements were [sic] that plaintiff would perform medical services as a licensed physician for and at defendant hospitals," and then goes on to refer to his "contractual right to perform medical services at defendant hospital[s]."

Since there was no written contract between the parties, the question becomes whether or not the "agreement" Dr. Thompson alleges created a contract for the purposes of a § 1981 action.

First, there is no constitutional right for a physician or surgeon to practice in a public hospital. *Hayman v. City of Galveston*, 273 U.S. 414, 416–17, 47 S.Ct. 363, 364, 71 L.Ed. 714 (1928). While courts in many states have ruled that any competent physician is entitled to admit his patients into *public* hospitals and to treat them there, *see, e.g. Henderson v. City of Knoxville*, 157 Tenn. 477, 9 S.W.2d 697, 698 (1928), the courts are generally powerless to intervene where a *private* hospital has denied privileges. *Id.* The Virginia Supreme Court has stated that

> when the trustees of a private hospital, in their sound discretion, exclude a doctor from the use of the facilities of the hospital, the courts are without authority to nullify that discretion by injunctive process. There are no constitutional or statutory rights of the doctor, or of his patients who wish to be treated in the hospital by him, which warrant such interference.

*Medical Center Hospitals v. Terzis*, 235 Va. 443, 446, 367 S.E.2d 728, 730 (1988) (quoting *Khoury v. Community Medical Hospital*, 203 Va. 236, 245, 123 S.E.2d 533, 539 (1962)). *See generally* Annot., *Exclusion of or Discrimination Against Physician or Surgeon by Hospital*, 37 A.L.R.3d 645 (1971).

Although the Virginia Supreme Court, in *Khoury* and *Terzis*, twice expressly refused to decide whether contractual rights are created when a physician joins the staff of a hospital, it is not alleged that Dr. Thompson was actually a staff physician; rather, it appears that he was a general

family practitioner who was being allowed to treat his patients in the three private hospitals which are defendants here. A holding that a contract would be formed by such an association would be stretching matters considerably, and would also, evidently, be contrary to common law. "At common law, absent a contractual obligation to the contrary, a physician's continued association with a private hospital was within the unfettered discretion of the hospital's administrators. Denial of staff privileges, for whatever reason or no reason at all, constituted no legal wrong." *Guibor v. Manhattan Eye, Ear & Throat Hospital*, 46 N.Y.2d 736, 413 N.Y.S.2d 638, 386 N.E. 2d 247 (1978).

Therefore, the court finds that the action of the defendants in allowing Dr. Thompson hospital privileges did not create a contractual association between them. Therefore, the complaint under the contract prong of § 1981 must also be dismissed.

### III.

■ Dr. Thompson's complaint also alleges a conspiracy in restraint of trade and an attempt to monopolize in violation of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2,[2] which conspiracy was designed to bring false charges of "inadequate care and negligent treatment" against him in order to provide an excuse for revoking his privileges, and to hold him to a higher standard of care than other doctors.

In reviewing a motion for dismissal under the Sherman Antitrust Act, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In applying this very high standard, of course, the court accepts as true the facts alleged in the amended complaint. *See, e.g., Mandeville Island*

*Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 222, 68 S.Ct. 996, 999, 92 L.Ed. 1328 (1948).

■ Jurisdiction under the Sherman Act may be obtained by showing either that the activity challenged occurred in interstate commerce, or that, although wholly local in nature, it nevertheless has an effect on interstate commerce. *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 202, 95 S.Ct. 392, 402, 42 L.Ed.2d 378 (1974); *Mandeville Island Farms*, 334 U.S. at 235–7, 68 S.Ct. at 1005–07. The plaintiff alleges that the hospitals are "engaged in an industry affecting commerce," not that the hospitals themselves are "in commerce." Therefore, the issue is whether he has made out a case that the challenged activity affects interstate commerce. *McLain*, 444 U.S. at 242, 100 S.Ct. at 509.

It is not necessary for the plaintiff to show that the conduct complained of has had an actual effect on interstate commerce; were this the case, "jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect." *Id.; United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 225 (n. 59), 60 S.Ct. 811, 846 (n. 59), 84 L.Ed. 1129 (1940). The "effect on interstate commerce" is determined not by the scope of the allegedly unlawful conduct but whether "as a matter of practical economics" the activities allegedly infected by the conspiracy "have a not insubstantial effect on interstate commerce." *McLain* at 246, 100 S.Ct. at 511; *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1975); *see Goldfarb v. Virginia State Bar*, 421 U.S. 773, 784 (n. 11), 95 S.Ct. 2004, 2011 (n. 11), 44 L.Ed.2d 572 (1975) ("It is in a practical sense that we must view an effect on interstate commerce.").

2. Although a violation of § 2 of the Sherman Act, 15 U.S.C. § 2, is alleged in that part of the Second Amended Complaint designated "Jurisdiction and Venue," the specific count of the complaint alleging antitrust violations refers only to a conspiracy in restraint of trade under § 1. Therefore, the court deems the § 2 claim, if there was indeed an intent to allege it, waived.

■ Accordingly, although the plaintiff can base antitrust jurisdiction on the broad range of the defendants' activities rather than just those activities that he especially challenges, the alleged effect on interstate commerce still must be more than merely derisory. This approach appears to have been adopted by the First, Second, Seventh, Eighth, and Tenth Circuits. *See Cordova & Simonpietri Agency v. Chase Manhattan Bank*, 649 F.2d 36, 45 (1st Cir.1981); *Furlong v. Long Island College Hospital*, 710 F.2d 922, 926 (2d Cir.1983); *Seglin v. Esau*, 769 F.2d 1274, 1280 (7th Cir.1985); *Hayden v. Bracy*, 744 F.2d 1338, 1342–3 (8th Cir.1984); *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715, 722–724 (10th Cir.1981) (en banc). The Ninth Circuit has taken the view that proving that the defendant had any general interstate business activities will satisfy the requirement for a "nexus" with interstate commerce. *Western Waste Services Systems v. Universal Waste Control*, 616 F.2d 1094, 1097 (9th Cir.1980), *cert. den.* 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).

In the absence of any Fourth Circuit ruling on this issue, the court adopts the approach of the majority of the circuits. As the Eighth Circuit has said, "[t]he reach of the Sherman Act, although expansive, is not without limit." *Hayden v. Bracy*, 744 F.2d at 1343.

Under this criterion, the plaintiff has fallen far short of alleging facts sufficient to establish Sherman Act jurisdiction. His allegations of an effect on interstate commerce are entirely conclusory: "a substantial lessening of competition and a substantial impact on interstate commerce resulting from the loss of patients by the plaintiff." There is nothing in the complaint to indicate that there are so few doctors in Wise County, Virginia, that the gain or loss of one of them would have a noticeable effect on the amount of competition. Nor is there any particular showing of how the plaintiff's loss of patients would affect interstate commerce. There is no allegation that a significant number of Dr. Thompson's patients came to him from outside Virginia. And although some courts have held that an effect on interstate commerce can be found in a denial of privileges case from the loss of Medicare and Medicaid payments (or medical insurance payments), and purchase of out-of-state medical supplies, *see e.g., Konik v. Champlain Valley Physicians Hospital Medical Center*, 561 F.Supp. 700, 710 (N.D.N.Y.1983), any effect in this case—even if it had been alleged, which it was not—would be *de minimis* in light of the fact that Dr. Thompson relocated his practice within Virginia.[3]

The language of the Seventh Circuit seems entirely apposite to the situation here:

> Plaintiff apparently believes that *Conley [v. Gibson]* mandates that any antitrust complaint in which the plaintiff merely alleges that the defendants acted in concert to ... interfere with plaintiff's employment opportunity is sufficient to withstand a motion to dismiss. But that it is not the law of this circuit.... In practice, ... a plaintiff cannot survive a rule 12(b)(6) motion merely by alleging bare legal conclusions while failing to set forth facts that 'at least outline or adumbrate' a violation of the Sherman Act.

*Seglin v. Esau*, 769 F.2d at 1279 (citations omitted).

Finally, there is considerable authority over the years for the proposition that the courts should not allow plaintiffs, by charging conspiracies in restraint of trade, to turn every case into a Sherman Act matter.

---

**3.** The effect on interstate commerce from Dr. Thompson's relocation cannot, in any case, be entirely laid at the defendants' door. Only St. Mary's terminated his privileges completely; he retained full privileges for everything but obstetrics at Wise, and full privileges for everything but the Intensive Care Unit at Norton Community. Therefore, he could still admit his patients into local hospitals for a full range of medical problems, though not necessarily into the hospital of his choice. According to his amended complaint, however, he now practices in an area of the state where he has not been able to obtain full privileges at the local hospital, and presumably this limits his ability to treat patients. These limitations would not have existed had he stayed in the Norton–Wise area. If the flow of commerce into Virginia has been affected, then, much of it can be ascribed to the plaintiff himself.

*Craig v. Sun Oil Co.,* 515 F.2d 221, 223 (10th Cir.1975) (fraudulent misrepresentation); *Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341, 343 (9th Cir.1969) (misrepresentation); *Ace Beer Distributors v. Kohn, Inc.,* 318 F.2d 283, 286 (6th Cir.), *cert. den.* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963) (interference with contract). The basis of Dr. Thompson's action is and has always been racial discrimination; the antitrust counts were sprung on the court and the defendants out of a clear blue sky by the last of the attorneys in his employ. The court has nonetheless given them careful consideration, but notes that in the cases where courts have upheld the bringing of antitrust complaints race has not been at issue. *See Konik,* 561 F.Supp. at 706; *Zamiri v. William Beaumont Hospital,* 430 F.Supp. 875 (E.D.Mich.1977). Since the real issue here is the allegation of racial animus, which the Sherman Act was obviously not intended to address, the court finds the line of cases limiting the practical reach of the Sherman Act to be persuasive. *See also Apex Hosiery Co. v. Leader,* 310 U.S. 469, 489, 60 S.Ct. 982, 989, 84 L.Ed. 1311 (1940) ("courts should interpret [the Sherman Act] in the light of its legislative history and of the particular evils at which the legislation was aimed.").[4]

Therefore, for all of these reasons, the court finds that the plaintiff's antitrust claims must be dismissed for failure to state a claim.

### IV.

 The only issues remaining are Dr. Thompson's state law claims of business conspiracy and breach of contract. Because his federal claims will be dismissed for failure to state a claim, there is no basis

for pendant jurisdiction of the state law claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Sigmon v. Poe,* 564 F.2d 1093, 1096 (4th Cir.1977).

An appropriate Order will be entered this day.

---

**4.** In addition to saying that the complaint should be dismissed on the ground that no restraint on interstate commerce can be shown, defendants urge dismissal on the ground that insufficient facts to prove a cognizable conspiracy have been alleged by the plaintiff. The cases defendants cite in support of their position are generally Rule 56 summary judgment cases, not Rule 12(b)(1) and (6) motion to dismiss cases. They follow *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79

L.Ed.2d 775 (1984), in which the Supreme Court laid down the proper standard for a party opposing summary judgment: "[T]here must be direct or circumstantial evidence that reasonably tends to prove ... a conscious commitment to a common scheme designed to achieve a common objective." *Id.* at 764, 104 S.Ct. at 1471. Since the interstate commerce issue is dispositive of the Sherman Act § 1 claims, the conspiracy (or "concerted activity") issue need not be considered further.